Jackson, Circuit Judge.
In this case libelants and appellants seek to recover the damages sustained by the schooner Delaware from a collision with the schooner Michigan, which occurred about 2:40 or 3 p. m. on April 30,1890, at the westerly entrance of the St. Mary’s Falls canal. It is alleged in the libel, and established by the proof, that the schooner Delaware, having no cargo aboard, was bound on a voyage from Buffalo, N. Y., to Ashland, in the state of Wisconsin; that on the 29th April, 1890, she was locked through the St. Mary’s Falls ship canal at Sault Ste. Marie, Mich. That, upon getting through the canal, she was weather bound, and unable to proceed on her voyage without the aid of a tug or steamer to tow her; that the only assistance she could obtain was from the steamer Ohio, which also came through the canal about the same time, having in tow the schooner Sheldon, on which her cargo had to be lightered in order to get through; that being unable to proceed alone, and having to await the departure of the steamer Ohio, which was detained the greater part of April 30,1890, transferring her cargo from the schooner Sheldon, the Delaware lay moored to the north pier of the west end of the canal, nearly abreast of the Dummy or Skeleton light, and just astern of the steamer Ohio, which had her tow (the Sheldon) outside and alongside of her; that the Dela ware tied *502 up to said north pier, at the place designated and directed by the canal superintendent, who, under the rules and regulations established for the use and government of the canal, had the authority, not only to permit the Delaware to moor to the pier, but to designate the place of mooring, the eighth rule for the government of the canal, established by the secretary of war under the act of congress approved July 5, 1884, being as follows: “Vessels or boats may be moored to the piers only when specially permitted by the superintendent, [of the canal,] and then only in such places and for such times as he may direct.” By the twelfth rule it is provided that “no vessel or boat shall in any way obstruct the canal or delay in passing through, unless permitted to do so by the proper authority. The neglect of any lawful order shall be construed as obstructing the free navigation of the canal.” The proof establishes that it was usual and customary for boats and vessels coming through the canal from the east to be tied up or moored, by permission and under the instruction of the canal superintendent, along the north pier thereof, at the westerly entrance, and extending down said pier to near the bridge crossing. The canal, at the point where the Delaware lay moored by the permission and direction of the superintendent, was 300 feet in width, and the navigable space between the port side of the Delaware and the south pier of the canal, along which vessels coming in from the west usually passed, was about 300 feet, was entirely free and unobstructed, and afforded ample passage way or room for all boats using the canal.
While the Delaware was thus lying at said north pier, on the afternoon of April 30, 1890, the propeller J. Emery Owen, towing the schooners Michigan and Nicholson, came down the river from the west, with a strong northwest wind, blowing at the rate of from 20 to 35 miles per hour; and the schooner Michigan, failing to get a line to the south pier of the canal to check or hold her, from some cause sheered to the windward or northward, and struck the Delaware at her mooring, and greatly injured her. The libel charges that the Michigan’s failure to obtain the assistance of a tug, or to get her line or lines to the south pier, where snubbing posts or piles were placed to enable descending vessels to eheck and control their movements, was careless and negligent navigation and management, and further alleges that the Michigan was negligent in not having her head sails ready and in position for use, so as to pay her off with the wind when the sheer towards the north pier commenced. The collision and damage thereby resulting to the Delaware it is charged was occasioned' solely by the negligence,'unskillfulness, and carelessness of the persons navigating the schooner Michigan.
The respondent admits the collision, and that it occurred at the time and place stated, and while the Delaware was moored at the north pier, but sets up, by way of defense—First, that the officers of the Delaware, in so mooring their vessel, were obstructing the free and proper navigation of the canal, and were guilty of great carelessness and want of skill and prudent, judgment, and that no permission or direction of the canal superintendent to moor at that point could operate to relieve said schooner *503 from the consequences of such want of skill and prudent care on the part of her officers, and that any damages the Delaware may have sustained while so lying at said pier, from vessels entering said canal, were the direct and immediate results of the carelessness and want of. skill and proper navigation of said vessel by her master; and, second, that the Michigan was in no fault, and guilty of no neglect, in failing to use her head sails or employ the assistance of a tug or in getting her line to the •■south pier in the usual way. It is alleged by the respondent that the strong northwest wind prevailing at the time—
“Caused an unusually strong current, and set back towards said north pier, which rendered the handling of said schooner Michigan extremely difficult; that said wind created a very heavy swell, breaking directly on the southerly ;pier of said canal, preventing the men sent in a yawl for that purpose from -affecting a landing and getting out a line to snub said schooner Michigan, -and bring her alongside of said southerly pier; that a line was sent from said -schooner Michigan by its yawl at the earliest moment possible, but the men so sent in said yawl, using all possible skill and care, were unable to get said line to the piles on said southerly pier, and were unable to bring their said yawl alongside of said south pier, so that the men could land thereon; that .although the wheel of the Michigan was placed hard aport as early as prudently could be, and was in that position when said schooner Michigan was abreast of the lighthouse, on the extreme west end of said south pier; that, although the wheel remained in that position, yet said schooner Michigan, after passing the propeller Ohio, took a sheer, caused by the action of the curfrent, wind, and swell, and struck said schooner Delaware.”
The district court made no finding or ruling as to whether the Delaware was lying or moored in an improper or exposed situation, so as to «charge her with fault or negligence, but having reached the conclusion that the schooner Michigan was not guilty of any want of care or proper -navigation and management, and that the collision arose from inevitable or unavoidable accident, dismissed the libel. From that judgment or decree the libelants have appealed.
The first question to be considered and determined is whether the .Delaware was chargeable with fault in being tied up or moored at an improper and exposed place. This court is clearly of the opinion that, under the facts and circumstances of the case, as shown by the undisputed proof, no fault or negligence can properly be imputed to the Delaware in mooring where she did. She tied up by the permission of the -canal superintendent, and at the place designated by him. She tied up ’there when only a fresh wind was prevailing. She was unable to proceed alone. She became weather bound, and was compelled to await the movements of the steamer Ohio, who was lawfully detained while transferring her cargo from the Sheldon. It was usual and customary for vessels and boats, under permission and direction of the superintendent of the canal, to tie up where the Delaware was moored. She in no wise obstructed the free and proper navigation of the canal while thus lying at her mooring; there being, at least, 300 feet of open, navigable water between her port side and the south pier of the canal opositó her position. When witnesses for respondent say that her position was a *504 dangerous and unsafe one, they must be understood to mean, not that her position was in the line of or obstructed the proper and free navigation of the canal on the part of other vessels, hut simply that, if vessels coming in or down from the west failed for any reason to make a line to the south pier, there was more or less danger of their sheering across the canal towards the north pier, and striking boats moored there. This is clearly explained by persons (recalled on behalf of respondent) who state that the only danger to boats mooring at the north pier was from vessels that failed to get their lines to the south pier, so as to hold and control their movements when coming in. It is shown by the evidence that incoming vessels rarely, if ever, failed to get their lines to the south pier, when exercising proper care and reasonably prudent management. It is also shown that the snubbing line thus usually carried to the south pier controlled the movements of the vessel, and kept her in proper position and place. Such lines sometimes broke when too weak or defective, or when the vessel had too much headway. But ordinarily vessels coming in from the west made their lines to the south pier, and thus controlled their movements, and a weather-bound schooner like the Delaware, unable to proceed on her voyage alone, and compelled to await the departure of the only boat she could obtain to tow her, is hardly to be condemned and found guilty of negligence in obeying the directions of the canal superintendent in mooring where she did, and in assuming that vessels coming in would make their lines to the south pier in the usual way. In The Mary Powell, 31 Fed. Rep. 624, Judge Brown says:
“By ‘dangerous exposure,'I understand, not the mere possibility of injury through some mischance not reasonably likely to occur, but an exposure that is clearly liable to receive or inflict injury, in the ordinary chances, mistakes, and hazards of navigation, such as are to be reasonably apprehended as liable to arise. ”
Tested by this rule, the Delaware’s place of mooring, even if it had been voluntarily selected by her officers instead of being designated by the canal superintendent under authority of law, cannot properly be said to have been culpably or negligently improper. By the twelfth rule for the government of the canal, if the Delaware, while weather bound and unable to proceed alone and awaiting her only obtainable motive power, had moored anywhere else than the place designated by the superintendent, she would have been chargeable with obstructing the free navigation of the canal. In obeying the lawful order of the proper authority, she cannot have it imputed to her as a fault that she either obstructed the free navigation of the canal or that she did not anticipate the contingency of some vessel coming in, failing to make its lines to the south pier as-usual, whereby she would be exposed to the ungoverned and uncontrolled movements of such vessel.
This court finds, therefore, as matter of fact and conclusion of law, that the Delaware, at the time of the collision, was not obstructing the canal; that she was properly moored and in a proper place; and that no fault is chargeable against her in connection with said collision.
*505 The Delaware being free from blame, and lying at anchor or properly moored, the burden of proof is upon the respondent to show either that the schooner Michigan was without fault, or that the collision was the result of inevitable accident, under the well-settled rule that where a moving vessel collides with another at anchor, or properly moored, the former is presumed to be at fault, and liable for the damage, and the burden of proof rests upon her to exonerate and clear herself. The Clarita and The Clara, 23 Wall. 13; Steamship Co. v. Calderwood, 19 How. 246; The Rochaway, 19 Fed. Rep. 449; The Echo, Id. 453; The Brady, 24 Fed. Rep. 300.
It is not material to consider the special faults or acts of negligence alleged against the Michigan in the libel. It is clearly shown that, by the employment of a tug then on hand at the west entrance of the canal, she could have controlled her movements. It is also made highly probable that, if her head sails had been ready for use, they could have been employed to counteract her sheer, by paying her off with the wind to such an extent as to have caused her to miss striking the Delaware. It is shown by the proof that the northwest wind, which was blowing strong as she came in, produced no sea to interfere with her own movements or proper control. The effect of that wind was simply to produce a small, choppy sea, which was not sufficient to prevent or materially interfer with a yawl from carrying a line to the south pier. It is disclosed by the proof that the first movement or tendency of the vessel coming in was to sheer towards the south pier; that, after getting well into the mouth of the canal, there was next a tendency, more or less strong, under different circumstances and conditions, to sheer towards the north pier. The position of the Delaware was seen by the officers of the Michigan. They were also well aware of the fact that, with a strong northwest wind prevailing, the Michigan was more than ordinarily liable to take the second sheer towards the north pier on account of her big cabin aft and large pilot house, which her master states caused her to sheer that day so .suddenly. They also knew that, if they failed to get a line to the south pier so as to use their snubbing line in holding and controlling the Michigan, she would, in sheering, collide with the Delaware or some other vessel moored at the north pier. The distance between the lighthouse at the west end of the south pier, and the Skeleton or Dummy light on the north pier, where the Delaware was tied up, is shown to be 1,500 or 1,600 feet. When the Michigan passed the lighthouse at the end of the south pier, her yawl, with three men, was ready and in position to be sent with the heaving line to said pier. It was, however, not started for the pier until the vessel had passed about half the distance between the two lights, say 750 or 800 feet from the lighthouse at the end of south pier. This is. the testimony of Calista D. Bornier, an employe of the canal, who was on the south pier abreast of the Michigan, and who had met the schooner at the west end of said pier, and followed her down. Cadotte, the master of the Michigan, expresses the opinion that his schooner had passed the lighthouse at west end of south pier about 500 feet, when the yawl was started for said pier. The *506 Michigan was moving at the rate of four or five miles an hour after passing the lighthouse. Three miles an hour afforded her good steerage way. It is shown by the testimony of respondent’s witness Bornier that it is not easy for a yawl to make a landing when the vessel is going four or five miles an hour. He further states the speed at which the Michigan was moving was a little too fast for her yawl to make the south pier safely. It is also shown that, just about the time the yawl, carrying the heaving line, reached or approached near to the south pier, the Michigan took the sheer that carried her over to the north pier, and against the Delaware. The proof is conflicting as to the length of line which the yawl carried, but the respondent’s witness Joseph Gammond, who was in the best position to know the fact, states that the line became tight, and that he was sticking it out from the boat going into the dock; and he further states, in answer to the question, “When the yawl boat came up towards the pier, when you had, as you say, a fathom and a half to two fathoms of line in the yawl, did you have enough to toss it to the man, [on the pier?] No; there wasn’t enough to reach the dock.” The heaving line, by means of which the snubbing line is drawn upon the dock, could readily, as the proof shows, have been thrown from 25 to 30 feet, if of sufficient length. The witness Gammond was in the bow of the yawl boat with , the heaving line. There were men on the pier ready to catch or receive it if the line had been thrown or tossed to them. It was not thrown, and for the reason stated by said Gammond, viz., there was not enough of that line to reach the pier. It is perfectly clear, therefore, that the yawl was started from the schooner with a line insufficient in length to reach the pier, or that it was started so late that the sheer of the Michigan took place before the yawl could reach the pier and that drew the line away. In either case, there was fault and bad management on the part of the Michigan. It is stated by the witness John Ivers that vessels going in from the west generally go pretty slow; that his vessel went at the rate of almost two miles an hour. Other witnesses say the slower the better. Ivers further states that the yawl boat carrying the heaving line to the south pier is usually started abreast of the lighthouse at the west end of the south pier. The Michigan passed the point from 500 to 750 feet before she started her yawl. She had in fact nearly reached the position at which she would sheer towards the north pier, when the yawl, with the heaving line, was started, and the expected sheer took place before or just as the yawl boat reached the pier, with no supply of heaving line to cast upon the dock. O’Donnell, the mate of the Michigan, states that schooners coming in, as the Michigan was, are generally handled with both forward and aft lines. The Michigan, however, sent out but the one forward line. That line was too short, was sent out too late, and it failed to reach the dock. Her officers knew that a failure to get her line ’ to the south pier would involve the safety of other vessels on the north pier. They knew, from the direction and strength of the wind, that extra care and diligence were required in the management of the vessel, and they ■content themselves with sending out a single line of insufficient length, *507 starting it later than usual, and with their vessel going faster than was prudent under the circumstances.
To call an injury resulting from such conduct and management an “inevitable accident” is a misnomer. A collision is said to occur by inevitable accident when both parties have endeavored by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident. This rule, announced in The Lochlibo, 3 W. Rob. 318, was adopted by the supreme court in Union Steamship Co. v. New York & V. Steamship Co., 24 How. 307— 313. So in case of The Morning Light, 2 Wall. 550, it is said that inevitable accident'“ may be regarded as an occurrence which the parties charged with the collision could not possibly prevent by the exercise of ordinary care, caution, and maritime skill.” The definition of inevitable accident given by the court in The Grace Girdler, 7 Wall. 203, does not conflict with that of the earlier cases, when it is said:
“Inevitable accident is where a vessel is pursuing a lawful avocation in a lawful manner, using the proper precautions against danger, and an accident occurs. The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances; such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view, the safety of life and property. Where there is a reasonable doubt as to which party is to blame, the loss must be sustained by the party on whom it has fallen.”
In The Glarita and The Clara, 23 Wall. 13, it is said that—
“Unless it appears that both parties have endeavored by all means in their power, with due care and a proper display of nautical skill, to prevent the collision, the defense of inevitable accident is inapplicable to the case.”
Whether the proper degree of care and caution has been exercised or neglected must be determined in all cases by references to the situation of the parties and all the attendant circumstances. Diligence and negligence are relative terms. The duty to exercise the one or to avoid the other is dictated and measured by the exigencies of the occasion. In proportion to the urgency of the situation or greatness of the necessity, the greater must be the care and vigilance employed. This is well expressed by the court in the case of The William Lindsay, L. R. 5 P. C. 338; also reported in 8 Moak, English R. notes 261, where it is -said, in reference to inevitable accident:
“How, the master is bound to take all reasonable precaution to prevent his ship doing damage to others. It would be going too far to hold his owners to be responsible because he may have omitted some possible precaution which the event suggests he might have resorted to. The rule is that he must take all such precaution as a man of ordinary prudence and skill, exercising reasonable foresight, would use to avert danger in the circumstances in which he may happen to be placed.”
It does not appear that the Michigan took any precautions to meet the contingency of her failing to get a line to the south pier. Could she cast upon other vessels the entire risk of such a contingency? Can it be said that without reference to her speed, without reference to the time or *508 place when or at which her line should be started for the dock, and without regard to the length of such line, a moving vessel can throw upon other vessels, properly moored or at anchor, the contingency or chance of her uncontrolled movements in the event her line fails to reach the pier, and that the stationary vessel must bear the consequences of such failure, as being the result of an inevitable accident? No case cited by counsel for respondent has gone to this extent, and so to hold would be to press the rule of inevitable accident beyond all sound principle. It is urged on behalf of respondent that, under the rule laid down in The Grace Girdler, 7 Wall. 203, “the court must find beyond a doubt that ordinary prudence and skill required her [the Michigan] to have used other means of getting the heaving line to the piers; that if the heaving line had reached the pier, the snubbing line could have been handled in time to prevent the accident,” before the Michigan can be found guilty of a fault or be condemned. This position is not sound. The Delaware being at anchor and free from blame, the burden of proof rests upon the Michigan to clear herself from fault. It was not incumbent upon the libelants to show affirmatively that she was guilty of negligence, of failed to exercise proper care.and skill under the circumstances. The burden is upon her to exonerate herself from blame. We may not and should not speculate, after the event, as to what acts or precaution might have prevented the accident; but it is clear, from all the facts and circumstances of the case, that the Michigan has failed to show that the collision was the result of inevitable accident. The court is also of the opinion that she has failed to rebut the presumption of fault which attaches to her from having collided with the Delaware while the latter was properly moored, and, furthermore, that the evidence establishes affirmatively that she was guilty of negligence and mismanagement in the particulars already mentioned, especially in reference to the line she attempted to send to the south pier.
The conclusion of the court upon the above case is that the decree of the district court dismissing the libel should be reversed, and that there should be a decree for the libelants, with the costs of this and the lower court to be taxed, and it is accordingly so ordered and adjudged, with the direction for such reference as may be necessary or desired to ascertain the amount libelants are entitled to recover for the damages done to or sustained by the Delaware.