### THE SYRACUSE.

### THE GRACE DANFORTH.

#### (District Court, N. D. New York. February 12, 1898.)

1. COLLISION—TUG MOORED IN HARBOR.

   It is not negligence for a tug to lie at the dock near the foot of Commercial street in Buffalo harbor; for, though the place is not a safe one, it is not more dangerous than other docks in the same harbor.

2. SAME—PROPELLER ENTERING BUFFALO HARBOR—EXCESSIVE SPEED.

   It is negligent navigation for a large, grain-laden propeller to enter Buffalo harbor, with the assistance of a single tug, at the unusual and dangerous speed of five or six miles an hour, especially when a strong gale is blowing, and a rapid current setting up the river.

3. SAME—TUG IN HARBOR.

A.tug undertaking to assist vessels into a narrow and dangerous harbor, like that at Buffalo, is bound to know the channel, the current, and whether, in the existing state of wind and water, it is safe to attempt to enter without further assistance.

4. SAME.

A tug assisting a steamer into a harbor is in fault for collision of the steamer with a vessel at a dock, where she permits the steamer to run past her, in the course of a sheer, so that the pull on the towline tends to throw her over so as to make it necessary to cast it off.

Libel by the Niagara Paper Company, owner of the steam tug Elk, to recover damages to said tug occasioned by a collision with the propeller Syracuse while the latter was being assisted, and partly towed, into the harbor of Buffalo by the steam tug Grace Danforth.

Clinton & Clark and George Clinton, for libelant.

George S. Potter and Harvey D. Goulder, for the Grace Danforth.

Josiah Cook, McMillan, Pooley, Depew & Spratt, and Maurice C. Spratt, for the Syracuse.

COXE, District Judge. At about 9 o'clock on the morning of November 26, 1895, the steam tug Elk was lying moored to the dock at the foot of Commercial street in the harbor of Buffalo. The Elk is a large tug, 96 feet long and $17\frac{1}{4}$ feet beam, having low-pressure engines and a detached condenser pump. She was left in charge of her fireman and deckhand, a young man about 17 years of age. Her master and her engineer were at the time on shore, attending to business connected with the tug. A severe gale was blowing from the southwest. The maximum velocity of the wind that day was 68 miles an hour, which is an unprecedented record for a November gale. At the time of the collision the velocity of the wind was about 40 miles per hour. The effect of this gale was to blow the water from the lake into the harbor, and it is undisputed that the water was unusually high, and that a strong current—about $3\frac{1}{2}$ miles per hour—was setting up the river, which at the point in question, opposite Commercial Slip, is 290 feet wide. While the Elk was lying moored in the manner described the Syracuse entered the harbor. The Syracuse is a large, powerful propeller, 280 feet long and about 38 feet beam. She had come from Chicago with a cargo of grain and flour. The Syracuse whistled for a tug, and the Grace Danforth responded. When opposite the old Buffalo light the tug took her line—about 35 feet in length—for the purpose of assisting her to the dock of the Western Transit Company, some distance up the river. The Danforth is a large and powerful tug, her dimensions being substantially the same as the Elk. When the Syracuse was passing the Watson Elevator she took a sudden sheer to port, and struck the Elk on her starboard quarter with a tremendous force, crushing the tug and breaking down the dock at which she was moored. The Danforth in the meantime had lost control of the propeller, and, when in danger of being rolled over, threw off the line. The following diagram, prepared by the court from the testimony, may, without pretense to perfect accuracy, serve to illustrate the situation and render further description unnecessary:

The libelant insists that the collision was due primarily to the fault of the Syracuse in proceeding at a dangerous rate of speed, and, perhaps, to the fault of the Danforth in failing to give proper signals to back, and in letting go the propeller's line at the time when help was most needed. The Danforth contends that the negligence of the Syracuse was the sole cause of the accident, and the Syracuse contends that it was due to the fault of the Danforth in not taking proper care of the propeller, and to the fault of the Elk in lying at a dangerous place, and in not moving away when the Syracuse commenced to sheer.

### The Elk.

The proposition that it was negligent for the Elk to lie at the dock near the foot of Commercial street cannot be maintained. It was a dangerous place, no doubt, but so is every other dock within the limits of Buffalo harbor. That the harbor, with its narrow, shallow, crowded water ways, is entirely inadequate to accommodate the immense commerce of the lakes is lamentably true, but the court would hardly be justified in holding a vessel negligent the moment she makes fast to a Buffalo dock. Although the court can take judicial notice

of previous disasters all along the line, the testimony fails to show a collision at the precise point in question. Now that the hiatus is filled, it is safe to presume that the chain of accidents is complete from the Ohio Basin to the harbor light. The point where the Elk lay was well within the harbor, at the widest part of the river. There are coal docks, elevators, and freight sheds all along the northerly side of the river. In the transactions of commerce it is necessary for boats of all kinds, from the stately steel propeller to the humble canal boat, to moor at these docks. It appears from the testimony that on the morning in question the docks all along the river were occupied. Vessels with no motive power of their own; barges, schooners and scows, must lie there, and, as they are entirely helpless to protect themselves against the blows of moving vessels, they must, invariably, be condemned if the contention of the Syracuse is to be maintained. The Elk is almost the exact size of a canal boat. A canal boat could have done nothing had she been in the place of the Elk at the time of the collision. She would have been compelled to do what the Elk did—remain where she was. And yet a decision against the Elk would include a canal boat as well, should the next victim happen to assume that shape. The proposition is untenable. The Michigan, 52 Fed. 501; The Hornet, [1892] Prob. Div. 361; The Nicholson, 28 Fed. 889–892.

It certainly was imprudent to leave the Elk, and especially so on such an inclement morning, in the sole charge of an inexperienced deckhand. If it were shown that this neglect in any way contributed to the injury the court would have no hesitation in finding the Elk guilty of negligence. The proof is, however, overwhelming to the effect that when the collision seemed probable there was not time to move the Elk into a position of safety. The peril was immediate, the time was counted not by minutes but by seconds. The Syracuse was only about 200 feet away when the sheer commenced. The theory that three men in the excitement of the moment could have thrown off the lines of the tug and started her pump and engine is too problematical to consider. If they could have done so it is by no means clear that they would have bettered the situation. In the circumstances which surrounded her it was not negligent for the Elk to maintain her position.

## The Syracuse.

That the propeller proceeded up the river at an unusual rate of speed is proved beyond question. No one denies this. It is conceded in the brief of counsel for the Syracuse. But they insist that this was inevitable because it was necessary for the propeller to go faster than the current in order to maintain steerageway. The current was running up the river at the rate of $3\frac{1}{2}$ miles an hour. The conditions on the morning of the accident were phenomenal if not unprecedented. A strong gale was blowing from the lake, a rapid current was setting up the river. The slips between the elevators acted as funnels through which the wind rushed with additional fury. One of these, at the Watson Elevator, is appropriately named "Hurricane Slip." In short,

the air and the water were full of eddies and cross currents which made navigation unusually difficult.    The entry into the harbor of a large steamer was, therefore, a most difficult and dangerous operation and required the utmost skill and care.    That the Syracuse was managed in a careless and imprudent manner is attested by a large preponderance of proof, and by the almost unanimous verdict of the disinterested witnesses who saw the steamer's course up the river.    Ordinarily the speed of vessels entering the harbor is from 1 to 3 miles an hour.    The Syracuse was going at the rate of 5 or 6 miles an hour, and faster than several of the witnesses had ever seen a vessel enter before. The master seems to have been oblivious to the strength and character of the current, and to have made his calculations accordingly.    The Syracuse behaved badly all the way up the creek.    She sheered on one or two occasions before the final sheer, and did not seem well in hand. Whether it was wise under the unusual conditions existing that morning to keep steerageway on her is a serious question.    It would seem, however, after balancing all the probabilities, that there was less danger in coming in with the current, leaving the steering and management of the steamer principally to the tug.    Certainly had she employed two tugs she would have reduced the chances of accident to the minimum.

It is not necessary to discuss the evidence in detail.    It establishes beyond cavil that the Syracuse came up the harbor at an unusual and dangerous rate of speed, and maintained it until it was too late to prevent the collision.    Practically all of the witnesses on the docks and other vessels who saw the Syracuse pass were astonished at her reckless course, anticipated disaster, and hastened to points of vantage from which to view the collision which seemed almost certain to occur somewhere in the vicinity of the Elk.    For this fault, which was the primary cause of the accident, the Syracuse must be held liable.

### The Danforth.

The Danforth, strictly speaking, was not towing the propeller. She was acting more as a rudder to assist the propeller into the harbor, the latter furnishing her own motive power.    The tug was neither an insurer nor a common carrier, and the highest possible degree of skill was not required of her.    On the other hand, she was bound to exercise reasonable skill and care, and their absence constitutes gross fault.    The law requires that she should know the perils of the harbor, and the best way to guard against them.    She was bound to know the channel, the current, and whether in the existing state of the wind and water it was safe to make the attempt to enter the harbor without further assistance.    The Margaret, 94 U. S. 494; The Nicholson, 28 Fed. 889, 893, 894.    The proposition seems to be undisputed that a tug cannot desert her tow at the supreme moment of peril unless she can excuse her action by the most urgent and imperative reasons.    The masters of the propeller and tug were both required to know the harbor, but the latter was required to have a more minute and accurate knowledge than the former.    Certainly on the morning in question he knew the exact situation, for he had left the harbor only about an

84 F.—64

hour and a half before. He knew, or should have known, of the unusual current, the high water, and of the eddies and cross currents caused by the wind and water rushing through the slips. He knew, generally at least, what vessels were in the harbor, and where they were moored. If he were unable to bring in the Syracuse safely, he should not have attempted it. If she were at fault for not employing two tugs, the Danforth was at fault also for attempting so dangerous a task alone. Although it would have shown a commendable prudence to have procured another tug, the court is not prepared to say that the failure to do so was negligence. The journey could have been made with one tug had ordinary prudence been observed. Of course the Danforth was going at the same rate of speed as the Syracuse, and was as responsible as the propeller for this recklessness if she directed or acquiesced in it. She insists that she repeatedly protested by signaling the propeller to check down and back, but this the propeller denies, and thus a question of fact is presented which is an exceedingly difficult one to determine. Assuming that the tug protested against the steamer's reckless speed, no criticism can be made of her course until the propeller commenced the fatal sheer. It is admitted on both sides that she took a position at right angles to the propeller, and pulled to starboard with all the power at her command. At the time the line was thrown off, the tug was careened over to port so that the water was over her port rail, had run through the hatches and into the firehold, and wet the coal on that side of the tug so that it could not be used. She was, in short, in imminent danger of capsizing. The court is inclined to the opinion that the tug had reached the climax of her usefulness. She could not overcome the sheer in the position in which she then was. She might have pulled a few seconds longer, but, whether rolled over or not, her capacity to help was about exhausted. After the propeller had run past her the tug's ability to pull the propeller's bow to starboard was greatly reduced. The fault of the tug was not so much in throwing off the line as in permitting herself to get into a position where such a course was necessary, where she might be "tripped up" and thus rendered useless. With a steamer going at the rate of five or six miles an hour it seems plain, if permitted to outrun a tug attached to her bow by a short line, that the tug and not the steamer must give way, especially when the size of the two boats is as unequal as in the case at bar. The situation in this regard was similar to that condemned by this court in the case of The Alpha, 27 Fed. 759, where the court said:

"When within a few hundred feet of the slip [Commercial Slip] the tug in her efforts to bring the barge safely around the curve, put her helm hard a-port, thus heading for the south side of the river. In this position the barge passed the tug, and, in seaman's parlance, 'tripped her up.' They were proceeding against the current at the rate of about four miles an hour, their courses forming an angle of about 45 degrees. A tremendous leverage was thus brought upon the hawser, which rolled the tug up almost upon her beam's end. No ordinary line could resist such a strain. It broke about a minute after the helm was put hard a-port. There can be no doubt that it was bad seamanship for the Alpha, with so short a line, and so heavy and unwieldy a tow, to permit herself to get into such a dilemma. This was negligence, and to it the collision is alone attributable."

It is seldom that two cases are so nearly parallel upon the facts. If the Danforth had been capsized, and her owners had libeled the Syracuse for the damages sustained, is it not plain that the court would have been compelled to say that her own fault was responsible, in part at least, for the disaster? The conclusion cannot be avoided that, had the Danforth kept in a position where she could have continued to pull, the injury to the Elk might possibly have been avoided, and at all events would have been much less severe. The libelant is entitled to a decree against the Syracuse and the Danforth, with costs, and a reference to compute the damages.